## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JENNIFER J. WALLACE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 11-CV-440-PJC** |
| | ) |
| **CAROLYN W. COLVIN, Acting Commissioner** | ) |
| **of the Social Security Administration,[1]** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Claimant, Jennifer J. Wallace ("Wallace"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her application for disability benefits under the Social Security Act,

42 U.S.C. §§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be

directly to the Tenth Circuit Court of Appeals.  Wallace appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Wallace was not disabled.  For the reasons discussed below, the

Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on June 7, 2010, Wallace was 33 years old.  (R.

28).  After completing the 8th grade, Wallace was home-schooled but did not get a GED.  (R.

---

[1]  Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

28-29).  Wallace had previously worked as a cashier/stocker and as a floor supervisor at a drug store.  (R. 30, 127).

Wallace claimed an inability to work primarily due to problems with her back, but also due to depression.  (R. 30).  Wallace described upper back pain at least once a day and chronic low back pain.  (R. 31).  Wallace testified that she tried going to physical therapy for three to four years and took pain medication on a fairly regular basis.  (R. 32).  The pain medication helped relieve some of the symptoms, but did not get rid of them.  *Id*.  Wallace described worsening of pain with cold or rainy weather.  (R. 32-33).  According to Wallace's testimony, she occasionally had pain that radiated into one or both of her legs, as well as stiffness and swelling in her legs, ankles, and feet.  *Id*.  The swelling occurred once or twice a month and would last anywhere from a couple of days, up to two weeks.  (R. 33).  She also testified that her hands, fingers, and face would also swell when her legs were swollen.  *Id*.  In addition, Wallace testified that she had six-hour headaches approximately once a month and experienced dizziness once or twice a day if she stood up too quickly.  (R. 33-34).

In describing her physical limitations, Wallace testified that she could stand only an hour or two total each day.  (R. 35).  She testified that standing caused severe chronic pain in her lower back, which would radiate into her legs.  *Id*.  She relieved this pain by lying down and applying ice or heat to the affected area.  *Id*.  Wallace described being able to sit for approximately an hour before her back would become stiff and she would need to get up and move around.  *Id*.  She estimated that she could sit for three to four hours total in an eight-hour day.  *Id*.  She testified that at her last job, there came a point where she could not stand or sit for more than an hour or two each day.  (R. 30).  Although she tried to take more breaks while working, she was not always able to, and had to reduce the number of hours she worked.  (R. 30-

31).

Wallace testified that the furthest she could walk at one time was one block.  (R. 36).
She sometimes would lose her footing and had fallen a couple of times.  (R. 36).  Wallace also
tried to avoid taking the stairs.  *Id*.  Wallace testified that if she kneeled, squatted, or crouched
down, she would either need someone to pull her back up or would need to hold onto something
to pull herself up.  (R. 36-37).  She testified that the heaviest she could lift was 15-20 pounds,
though she did not feel comfortable doing so due to back pain.  (R. 37).

In a typical day, Wallace described sitting on the couch watching television and doing a
little around the house.  (R. 40).  Wallace testified that she could do household chores for thirty
minutes to an hour, but would then need to take at least an hour break.  (R. 38).  She explained
that mopping and sweeping were the most difficult chores for her to complete due to muscle
spasms.  *Id.*  Wallace described difficulty sleeping at night due to pain, even with sleeping pills
and muscle relaxers.  (R. 37).  She testified that on a good night, she would get six to eight hours
of sleep, but two or three times a week, she would get no sleep at all.  *Id.*  Wallace also described
that in order to get dressed, she had to sit down to put on certain articles of clothing because she
was unable to bend over.  *Id.*

Wallace had previously been on blood pressure medication but had weaned herself off of
it because she did not believe she needed it.  (R. 34).  When asked about side effects from her
other medication, Wallace described drowsiness, dizziness, double vision, and nausea.  (R. 34-
35, 37).  She was reluctant to drive because of the double vision and drowsiness.  (R. 37).

In addition to her physical complaints, Wallace testified that she suffered from
depression.  (R. 30, 39).  She described feeling depressed when she thought about her disabilities
and her desire to start a family or her desire to be more active.  (R. 39).  Wallace testified that

she had crying spells a couple of times a week, which would last a couple of hours.  *Id.*  She also testified that she was afraid she would have a panic attack when she was in a crowd and that she occasionally felt uncomfortable leaving the house.  (R. 38-39).  Wallace described some difficulty with her memory, such as forgetting why she went into a room or where she was going while driving.  (R. 38-40).

On November 2, 2000, after complaining of low back pain, Wallace had an MRI scan of the lumbar spine completed.  (R. 361).  The scan revealed 1) a small central protrusion at L5/S1 effacing the ventral fat and mildly impressing the medial aspect of the right exiting S1 nerve root, and 2) transverse high intensity zone at posterior-inferior annular margin of L5/S1 representing granulation tissue or outer annular fissuring.  *Id.*

Wallace was treated by her primary care physician, J. Dewayne Geren, D.O., several times from January 2004 through August 2004 for seasonal allergies, bronchitis, pharyngitis, asthma, and sinusitis.  (R. 330-36).  On August 11, 2004, Wallace reported to Dr. Geren for the first time that she had experienced  frequent lower back pain since being involved in an accident eight years earlier.  (R. 329).  Wallace indicated that an MRI taken at the time showed a bulging disk.  *Id.*  She also reported that the pain had been worse recently after sleeping overnight.  *Id.*  Dr. Geren indicated that her structural and neurological exams were symmetrical and that she had negative straight leg raises.  *Id.*  He prescribed Motrin and Flexeril and recommended Wallace rest and engage in no lifting.  *Id.*

According to medical records, Wallace reported injuring her back on the job at Drug Warehouse on August 14, 2004, while unloading and lifting boxes.  (*See e.g.,* R. 191, 232, 255).  However, this injury was not noted during Wallace's follow-up appointment with Dr. Geren on August 18, 2004.  (R. 328).  Dr. Geren simply noted that the Flexeril made her sleepy, that there

had been "little improvement," and that Wallace reported that she still had discomfort in her lower back.  *Id*.  Neurological examination was noted as symmetrical.  *Id*.  Dr. Geren noted that an MRI revealed central disk protrusion at L5/S1 and he referred Wallace for a neurosurgery consultation.  *Id*.

Wallace was treated by Dr. Geren from October 2004 through December 2004 for gastrointestinal issues, knee pain, and chest pain, but there were no further notations of back pain.  (R. 323-27).  Other medical records indicate that Wallace received steroid injections in October and November 2004 for a herniated disk at L5-S1 from Gerald Hale, D.O., but records from those visits were not provided.  (R. 191, 233).

On April 19, 2005, Wallace presented to Dr. Geren and requested more pain medication. (R. 322).  She reported that the neurosurgeon recommended a diskectomy[2] after the injections failed and that she was waiting on a decision regarding her worker's compensation claim.  *Id*. After noting the dates Lortab prescriptions had been provided, Dr. Geren expressed concern to Wallace regarding potential addiction and noted that he would refer her to a pain management specialist if a decision was not soon made regarding her claim.  *Id*.

Wallace underwent a diskectomy on or about June 1, 2005.[3]  (R. 191).  On June 9, 2005, Wallace sought treatment from Dr. Geren for blisters on her hand and for an orthopedic consultation on her right knee.  (R. 321).  Dr. Geren noted that Wallace had recently undergone back surgery.  *Id*.

On July 8, 2005, after complaining of low back pain and right leg pain, Wallace had an

---

[2] A diskectomy is an "excision of an intervertebral disk." *Dorland's Illustrated Medical Dictionary* 526 (29th ed. 2000) (hereinafter "*Dorland's*").

[3] There are no medical records from this procedure; it is simply noted in subsequent records.

MRI of her lumbar spine.  (R. 238).  It was noted that she had a prior lumbar surgery and the MRI revealed "degenerative changes at L5-S1 with post surgical granulation tissue in the lateral recess on the right encompassing the S1 nerve root as it traverses the lateral recess."  *Id*.  After reviewing the MRI, Gregory L. Wilson, D.O., opined that Wallace did not need further surgical intervention as the results were expected, and there was no evidence of recurrent disc herniation. (R. 241).  Dr. Wilson prescribed Neurontin to see if Wallace's pain could be controlled with medication.  *Id*.

On July 28, 2005, Wallace had a follow-up appointment with Dr. Wilson and reported that although her pain was not completely eliminated, the Neurontin seemed to be helping and the intensity of the pain was decreasing.  (R. 240).  Dr. Wilson noted that in addition to the Neurontin, the pain medication Darvocet[4] was also controlling the pain.  *Id*.  Dr. Wilson opined that Wallace was "still temporarily totally disabled" and referred her to physical therapy.  *Id*.

After completing physical therapy,[5] Wallace had another appointment with Dr. Wilson on September 8, 2005.  (R. 239).  Dr. Wilson noted that although the physical therapy helped the strength in Wallace's leg, she continued to have pain in her right hip and leg.  *Id*.  Because Wallace had not made significant progress in recovery, Dr. Wilson referred Wallace to Dr. Pettingell for medical management of her ongoing radicular pain.  *Id*.

On October 14, 2005, Wallace had a consultive examination with Timothy G. Pettingell,

---

[4] Darvocet was a prescription pain medication that was withdrawn from the market in 2010 at the FDA's request. *www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ ucm234350.htm* (last accessed March 18, 2013).

[5] The physical therapy records are not part of the record and it is not clear when or how often Wallace attended.  One record indicates she completed 12 sessions in late September 2005 at Owasso PT, but this conflicts with Dr. Wilson's notes from September 8, 2005 that physical therapy had already been completed.  (R. 191, 239).

M.D. (R. 191-93).  Wallace reported low back pain, pain and tingling of the right lower extremity, numbness of the left thigh, tingling of the left small toe, and occasional cramping in the left thigh.  (R. 191).  Examination revealed tenderness to palpation at the midline lumbar spine, the posterior superior iliac spine, the greater trochanter[6] region, and at the incision site. (R. 192).  Straight leg tests were negative, back extension did not exceed 10 degrees past neutral, and finger to floor forward bending was at the midshaft tibia.  *Id.*  Neurological examination showed no atrophy or fasciculations,[7] and normal strength, but diminished sensation to light touch of the right dorsal foot and posterior aspect of the leg.  *Id.*  Dr. Pettingell's impression was chronic low back pain, post work-related injury and status post L5-S1 discectomy.  *Id.*  He recommended electrodiagnostic testing and a medication regimen of Neurontin, Lidoderm,[8] and Darvocet.  (R. 192-93).  Dr. Pettingell opined that Wallace could return to work and provided a work release indicating that Wallace could return to work full-time, but was restricted to lifting, pushing, or pulling a maximum of 10 pounds.  (R. 193, 207).

Wallace had a follow-up visit with Dr. Pettingell on November 7, 2005 and reported a 50% reduction in low back pain from application of the Lidoderm patch.  (R. 188).  She also reported that an increase in the dosage of Neurontin improved her lower extremity symptoms by 50%.  *Id.*  Electrodiagnostic testing was performed and the results demonstrated only mild abnormalities, which Dr. Pettingell found they was consistent with mild right L5 and mild left S1 radiculopathy.  (R. 188-90).  Dr. Pettingell recommended conservative treatment continue and

---

[6] The greater trochanter area is at the upper end of the lateral surface of the femur. *Dorland's* at 1881.

[7] A fasciculation is a small contraction of muscle, visible through the skin.  *Dorland's* at 654.

[8] Lidoderm is a local anesthetic used for pain relief.  *www.pdr.net.*

ordered an epidural steroid injection.  (R. 188).

On November 28, 2005, Wallace received a steroid injection and nerve root block at L5-S1.  (R. 233-34).  Dr. Hale performed the procedure and noted that despite the previous diskectomy, Wallace continued to have burning and pain down her right leg and into the foot and ankle.  (R. 233).  Dr. Hale also noted that electrodiagnostic tests revealed mild S1 radiculopathy.[9]  *Id*.  After the procedure, Wallace reported no discomfort or burning in her leg. (R. 234).

On November 30, 2005, Wallace called Dr. Pettingell's office complaining of pain, but indicated that she was going to work.  (R. 221).  Dr. Pettingell called in a prescription for Norco.[10]  Wallace called his office again on December 12, 2005 and reported that she was still in a lot of pain.  (R. 219-20).  In response, Dr. Pettingell indicated another MRI should be scheduled.  *Id*.

Wallace had a follow-up visit with Dr. Pettingell on December 5, 2005, and indicated that the epidural steroid injection resulted in greater low back pain and was of no benefit.  (R. 186-87).  Dr. Pettingell noted that the prescription for Norco was also of no benefit and was equal to Darvocet for pain relief.  (R. 186).  Upon examination, Wallace had painful flexion and extension, and straight leg raises resulted in low back pain.  *Id*.  Dr. Pettingell encouraged Wallace to continue with home exercises and her current medications, and noted that she could continue to work light duty.  (R. 187, 206).

Wallace had another MRI of her lumbar spine completed on December 14, 2005.  (R.

---

[9] Radiculopathy is a disease of the nerve roots.  *Dorland's* at 1511.

[10] Norco is a combination of acetaminophen and hydrocodone and is used to treat moderate to moderately severe pain. *www.pdr.net*.

236).  The same post-surgical changes at L5-S1 were noted, but where the previous MRI had shown "extensive granulation tissue to the right of midline, there [was now] unenhancing tissue associated with this suggesting either a loss of vascularization to the scar or contribution by a protruding disc."  *Id*.  That same day, Wallace presented to Dr. Geren with complaints of lower right arm pain subsequent to picking up a light object.  (R. 320).  Dr. Geren opined that it was probable tendonitis.  *Id*.

On January 5, 2006, Wallace presented to Dr. Pettingell and did not have any new complaints, but reported that her baseline low back pain and extremity symptoms had returned to pre-injection level.  (R. 184).  Dr. Pettingell noted that the MRI demonstrated postoperative changes at the L5-S1 level and opted to prescribe a TENS[11] unit trial.  *Id*.

At Wallace's next appointment with Dr. Pettingell on February 6, 2006, she reported that the TENS unit had not been helpful and that she continued to experience daily low back pain, even with medication and averaging six Darvocet tablets per day.  (R. 182-83).  It was noted that Wallace was working full-time and Dr. Pettingell recommended the restrictions of lifting, pushing, and pulling a maximum of 10 pounds remain in effect.  (R. 182, 204).  Dr. Pettingell continued Wallace's current medications and the TENS unit trail, and indicated she could take hydrocodone for severe pain.  (R. 182).  He also recommended a reevaluation with Dr. Wilson regarding further invasive treatment.  *Id*.

On April 6, 2006, Wallace reported to Dr. Geren that the right arm discomfort she had experienced in December had initially improved, but had since become worse.  (R. 320).  She expressed that the most bothersome part was a tingling sensation just above her right wrist.  *Id*.

---

[11] TENS stands for transcutaneous electrical nerve stimulation.  *Dorland's Illustrated Medical Dictionary* 1905 (31st ed. 2007) (hereinafter "*Dorland's* 31st").

One week later, Wallace continued to have unresolved right wrist pain. (R. 319).

There are no medical records from April 6, 2006 until March 21, 2007, despite the fact that Wallace underwent a spinal fusion in June 2006. (*See* R. 318). On March 21, 2007, Wallace returned to Dr. Geren for a follow-up visit regarding her lower back pain, which he had not treated her for since April 2005. (R. 318). Dr. Geren noted her diskectomy from June 2005 and a spinal fusion in June 2006. *Id*. Wallace reported that she had also been seen by an orthopedic surgeon who advised that she may need another surgery to remove the fusion hardware. *Id*. Wallace reported that she did physical therapy after the fusion, but continued to have pain and continued to take Lortab on a regular basis. *Id*. Examination revealed point tenderness in the lumbosacral area. *Id.* Wallace had a symmetrical structural exam and had no pain with straight leg raises. *Id*. Dr. Geren refilled her Lortab prescription, prescribed a Medrol Dosepak,[12] and recommended a consultation with an orthopedic surgeon. *Id*.

Wallace had a follow-up appointment with Dr. Geren on March 28, 2007. *Id*. Dr. Geren noted that Wallace had completed the Medrol and had been able to reduce the frequency of Lortab to every eight hours. *Id*. Wallace continued to have no pain during straight leg raises and had a symmetrical structural examination. *Id*. Dr. Geren noted that Wallace was waiting for the Worker's Compensation Court to approve the orthopedic consultation. *Id*. He recommended Wallace reduce her Lortab dose and prescribed Naprosyn[13] to take in the evening, which reportedly was when Wallace was in the most pain. *Id*.

On April 18, 2007, Wallace presented to Dr. Geren again and reported that the Naprosyn had helped some at night and that she had a court date the following day regarding her

---

[12] Medrol is a steroidal anti-inflammatory medication. *www.pdr.net*.

[13] Naprosyn is a non-steroidal anti-inflammatory. *www.pdr.net*.

orthopedic consultation.  (R. 317).  Dr. Geren noted Wallace had point tenderness in the lumbosacral spine, but no flank tenderness and no pain with straight leg raises.  *Id.*

After receiving a referral from the Worker's Compensation Court, on May 16, 2007, Wallace was examined by Randall L. Hendricks, M.D. (R. 245-46).  Wallace reported an increase in bilateral pain in her lower back, with it being worse on the left side.  (R. 245). Wallace complained of difficulty sleeping, throbbing in the legs, and some numbness and tingling in the toes, but not any remarkable increase in sciatica.[14]  *Id.*  Dr. Hendricks noted "tenderness in the paraspinal musculature over the orthopedic hardware with no major neurologic deficit" and opined that the hardware was causing Wallace's pain.  *Id.*  Before proceeding with surgical removal of the hardware, Dr. Hendricks recommended Wallace obtain another MRI of the lumbar spine to rule out any other cause.  *Id.*

On May 21, 2007, Wallace underwent an MRI of her lumbar spine, which revealed an interval midline laminectomy[15] defect at L5-S1.  (R. 243).  It also showed soft tissue of intermediate signal intensity along the peripheral margin of the right S1 nerve root, which likely represented postsurgical fibrosis.[16]  *Id.*  However, the right S1 nerve root compression that had previously been recorded was no longer visible.  *Id.*  After reviewing the MRI, Dr. Hendricks noted that he did not identify any specific pathology that needed to be addressed and opined that because Wallace had tenderness in the area over the orthopedic hardware, that the hardware needed to be removed.  (R. 247-48).

On May 29, 2007, Dr. Hendricks surgically removed the orthopedic hardware and

---

[14] Sciatica is characterized by pain radiating from the back into the lower extremity. *Dorland's* at 1609.

[15] Laminectomy is the excision of the posterior arch of a vertebra.  *Dorland's* at 960.

[16] Fibrosis is the formation of fibrous tissue.  *Dorland's* at 673.

explored the fusion, found no breach or penetration in the pedicle[17] holes, no instability of the

fusion, and healthy mature-appearing bone.  (R. 244).  When Wallace had a follow-up

appointment with Dr. Hendricks on June 13, 2007, she reported that her back pain had improved,

but that she still had a little numbness in her toes.  (R. 249-50).  Dr. Hendricks indicated that

Wallace could return to work with light duties after two weeks.  (R. 249).

On July 9, 2007, Wallace returned to Dr. Hendricks and reported that after she returned

to work, she had a flare-up of her left leg pain, which was substantially relieved by a Medrol

Dosepak.  (R. 251-52).  Wallace questioned whether the Lortab could be contributing to her

migraine headaches and agreed to discontinue it and try Ultram instead.  (R. 251).  Dr. Hendricks

indicated Wallace was to continue working at light duty until her next appointment.  *Id.*

On August 20, 2007, Dr. Hendricks released Wallace from her work-related injury and

opined that she had reached maximum medical improvement.  (R. 253-54).  Dr. Hendricks noted

that Wallace was doing well back at work, though she did have a 30-pound weight restriction.

(R. 253).  Wallace reported that she still took a few Darvocet per day and Dr. Hendricks

recommended that she be allowed to get periodic refills, but would ultimately prefer her to be

weaned off of it and switched to ibuprofen.  *Id.*

At the request of her attorney, on August 27, 2007, Wallace was examined by Kenneth R.

Trinidad, D.O., for a permanent impairment evaluation.  (R. 255-60).  Wallace complained of

pain and stiffness in her lower back, which was worsened by bending, stooping, or lifting.  (R.

256).  She reported difficulty standing more than 10 minutes and sitting more than one hour.  *Id.*

Wallace described weakness, sensory loss, and paresthesias into her right leg as well as

---

[17]A pedicle is a "footlike, stemlike, or narrow basal part or structure, as the stalk by
which a nonsessile tumor is attached to normal tissue, or the narrow strip of flap tissue through
which it receives its blood supply."  *Dorland's* at 1340.

intermittent pain and parathesias in her left leg.  *Id*.  Upon examination, Dr. Trinidad noted

tenderness and spasm in Wallace's lumbar spine from L5 through S1 bilaterally with particular

tenderness over the sacroiliac joints bilaterally.  *Id*.  Range of motion testing in Wallace's lumbar

spine showed extension of 10 degrees, flexion of 35 degrees, right lateral bending at 10 degrees

and left lateral bending at 15 degrees.  (R. 257).  Straight leg raises were negative, and there was

decreased sensation and weakness in the right leg.  (R. 256-57).  Dr. Trinidad opined that

Wallace had reached maximum medical recovery, noting that her condition was stable and

chronic.  (R. 257, 259).  Dr. Trinidad found Wallace to have a 51% permanent partial

impairment caused by injury to her lumbar spine and the associated right leg radiculopathy.  (R.

259).

On September 4, 2007, Wallace was seen by Dr. Geren and reported that she had very

little improvement in her symptoms since her hardware removal.  (R. 316).  Dr. Geren refilled

her pain medication and referred her to a pain management specialist.  *Id*.

On October 4, 2007, Wallace presented to Jeffrey M. Calava, D.O., after being referred

by Dr. Geren for a pain evaluation.  (R. 307-10).  Wallace complained of sacroiliac pain in both

her legs and feet, as well as intermittent numbness, tingling, and weakness of her legs.  (R. 308).

She described her pain as a constant "throbbing, pounding and gnawing sensation," which varied

in intensity from a 3 (out of 10) to a 7, and was aggravated by prolonged standing, bending or

lifting.  (R. 307).  Wallace indicated medication helped relieve approximately 30% of her pain,

but believed the medication gave her headaches.  *Id*.  Upon examination, Wallace experienced

mild tenderness with palpation over the lower lumbar facet joints, moderate tenderness from L3

to S1, and pain with extension of the lower lumbar spine.  (R. 308).  Wallace ambulated in a

slightly stooped forward gait, but could assume an upright position fairly easily without

catching.  *Id.*  Wallace's deep tendon reflexes were flat at the knee and diminished at both

ankles, she had mild sensory loss along L4 and L5, and she had some weakness of the extensor

hallucis longus[18] tendon.  *Id.*  Dr. Calava's diagnoses were chronic lumbar and bilateral leg pain,

degenerative disc disease of the lumbar spine, and status-post microdiscetomy followed by

lumbar fusion.  (R. 308-09).  Dr. Calava changed Wallace's medication and  recommended

another MRI be conducted, as well as an EMG and nerve conduction study.  (R. 309).

Wallace returned to Dr. Calava on October 22, 2007.  (R. 299-300).  She reported that her

pain symptoms were unchanged and that the medication changes helped about 20%.  (R. 299).

The MRI from October 4, 2007 revealed "significant epidural scarring at the L5-S1 level which

[was] partially encasing the posterior aspect of the thecal sac."[19]  *Id.*  Wallace continued to

complain of radiating back pain and Dr. Calava recommended a series of percutaneous lysis[20]

procedures using an epidural catheter to break up the epidural adhesions.  (R. 299-300, 305).

On October 29, 2007, Wallace was examined by William R. Gillock, M.D., for the

purpose of establishing a worker's compensation impairment rating.  (R. 261-67).  Wallace

reported feeling better overall since the surgeries, but still complained of pain in her lower back

and right leg, most of which was relieved by sitting, and intermittent numbness of her right foot.

(R. 263).  During examination, Wallace reported pain over her lumbar spine, which radiated

down the right leg to her foot.  (R. 264).  Dr. Gillock noted that Wallace's posture and unassisted

gait were normal, pinprick sensory examination was normal, muscle strength of the lower

---

[18] The extensor hallucis longus tendon is attached to a muscle that extends from the fibula down the leg to the big toe. *Dorland's* at 1797, *Barrett v. Sedgwick CMS*, 2011 WL 4860011 *3, n. 4 (D. Minn. Oct. 7, 2011) (unpublished).

[19] This indicates that the scar tissue was impeding on the enclosing case of the spinal dura mater, which is a fibrous membrane covering the spinal cord.  *Dorland's* at 550, 1822.

[20] Lysis is a process of cell destruction.  *Dorland's* at 1041.

extremities were equal, reflexes were symmetrical and normal, and straight leg raises were negative.  (R. 264-65).  Range of motion testing of the lumbar spine revealed sacral flexion angle of 30 degrees, flexion at 40 degrees, extension at 25 degrees, and right and left lateral flexion at 25 degrees.  (R. 265).  Dr. Gillock opined that Wallace had reached maximum medical improvement and required no additional treatment or continuing medication maintenance.  (R. 266).  Dr. Gillock found that Wallace had a 17-18% permanent partial impairment to her lumbar spine, with no permanent partial impairment to her legs.  *Id.*

Wallace had a follow-up visit with Dr. Calava on November 19, 2007.  (R. 297-98).  Dr. Calava noted that the findings from the nerve studies and EMG were consistent with a mild L4 and/or an L5 radiculopathy bilaterally.  (R. 297).  Wallace reported no change in her symptoms and was tolerating her pain medication.  *Id.*  The lysis procedure Dr. Calava had recommended to break up the adhesions was put on hold while Wallace waited to settle her Worker's Compensation case and for her new insurance to take effect.  *Id.*

Wallace reported to Dr. Geren that she had an episode of syncope[21] on February 17, 2008.  (R. 316).  She described that after arising from a sitting position, she became dizzy, lightheaded, had tunnel vision, and then fell when she lost consciousness.  *Id.*  She reported that she had gone to the emergency room at St. John's in Owasso[22] and had a "positive" tilt table test.[23]  *Id.*  Dr. Geren opined that the syncope was "probably diet related" because Wallace had a

---

[21] Syncope is a medical term for fainting or loss of consciousness.  *Dorland's* at 1747.

[22] There were no corresponding medical records from St. John's provided to this Court for review.

[23] A tilt table test involves strapping a patient to a table and then tilting it to and angled or upright position and is designed "to measure the patient's heart rate and other vital signals to determine how [s]he reacts to the change in position." *E.E.O.C. v. Schneider Nat., Inc.* *1 (E.D.Wis. May 31, 2006) (unpublished).  It is commonly used to evaluate and diagnose the cause of a syncope. *See http://www.mayoclinic.com/health/tilt-table-test/MY01091* (last accessed

very irregular diet.  *Id.*  Dr. Geren noted that Wallace was scheduled for a cardiology consultation.  *Id.*

Wallace underwent the first and second percutanerous lysis procedures by Dr. Calava on February 22, 2008 and March 14, 2008.  (R. 303-06).  Wallace had no complications from either procedure.  *Id.*

On March 24, 2008, Wallace had a follow-up appointment with Dr. Geren and reported that her dizziness had resolved since increasing her diet and gaining a little weight.  (R. 315).  However, she did report an increase in migraines and one episode of severe heart palpitations that lasted for several minutes.  *Id.*  Dr. Geren noted that results from a 24-hour Holter monitor revealed no pathologic arrhythmia and he recommended a head CT and echocardiogram.  *Id.*

On March 26, 2008, Wallace was evaluated by James W. Dean, M.D. regarding her migraines, dizziness, and blackouts.  (R. 276-80).  Wallace reported she had been experiencing headaches once or twice a week for a few months, but over the last week, was having daily headaches.  (R. 276).  She described these headaches as being located in the right or left frontal section (focal), were associated with nausea and sometimes vomiting, and accompanied by sensitivity to light and sound.  *Id.*  Wallace also reported the syncope episode from the previous month, but indicated that it had not been accompanied by a migraine.  *Id.*  After that episode, Wallace reported experiencing dizziness when bending over or arising from a seated position, but that those symptoms had been diminishing.  *Id.*  Dr. Dean referred Wallace to Dr. James Coman for further evaluation.  (R. 277).

Wallace was seen by Dr. Coman on April 3, 2008.  (R. 271-74).  In addition to the syncope episode, Wallace reported palpitations in the middle of the night that would awaken her,

---

January 24, 2013).

as well as intermittent numbness and tingling radiating down her left arm.  (R. 272).  Dr. Coman found Wallace's symptoms to be consistent with a neurocardiogenic[24] syncope and recommended an echocardiogram and myocardial perfusion scan be completed as well as a 30-day cardiac event monitor.  (R. 272-73).

Wallace called Dr. Dean on April 4, 2008, with complaints of head pressure, coldness, and tingling.  (R. 270).  Dr. Dean prescribed Wallace with additional migraine medication and recommended an MRI scan of the brain.[25]  *Id.*

The third and final lysis procedure was completed without complications by Dr. Calava on April 11, 2008.  (R. 301-02).  On April 23, 2008, Wallace reported to Dr. Dean that she had recently gone to the hospital twice for migraines.  (R. 269).  Dr. Dean prescribed her with Topamax.[26]  *Id.*

On April 22, 2008, Wallace had a follow-up appointment with Dr. Geren.  (R. 315).  Wallace reported that she had gone to the emergency room for a severe migraine.  *Id.*  She also reported that if she did not take Zomig,[27] which had been prescribed at the hospital, she experienced daily headaches.  *Id.*  Dr. Geren refilled her prescriptions and noted that Wallace was having increasingly frequent migraines, and that she was to follow-up with scheduled neurology and cardiology appointments.  *Id.*

Wallace had a follow-up appointment with Dr. Calava on May 8, 2008 after completing

---

[24]  A neurocardiogenic syncope is one associated with the nervous system and heart.  *Dorland's* 31st at 1282.

[25]  The MRI was completed on April 16, 2008, and with the exception of an incidental cyst in Wallace's sinus cavity, it was unremarkable.  (R. 275).

[26]  Topamax is used to treat migraine headaches and seizures.  *www.pdr.net.*

[27]  Zomig is used to treat acute migraine headaches.  *www.pdr.net.*

the three lysis procedures.  (R. 291-92).  She reported that the pain in her right leg was gone, though it still had some numbness and tingling.  (R. 291).  Wallace also reported that she had been "doing great" but had recently strained her back while working in her yard and was experiencing back pain and muscle spasms.  *Id*.  Dr. Calava performed three myofascial trigger point injections in Wallace's spine to treat the lumbar strain.  (R. 291-92).  Wallace also complained of insomnia, and Dr. Calava prescribed Ambien.  *Id*.

On May 21, 2008, Wallace presented to Dr. Dean with a return of her headaches.  (R. 268).  Wallace reported that the headaches were now bifrontal and were accompanied with tingling of her face, hot pressure, nausea, and photosensitivity.  *Id*.  Dr. Dean noted that according to Wallace, the tilt table testing "was not overtly positive despite her history of orthostatic symptoms and that there may have been a 'hole in her heart' found.  I suspect this may be a patent foramen[28] ovale by her description."  *Id*.  Dr. Dean indicated his office would obtain test results and consultative opinions and that Wallace would be seen as needed.  *Id*.

On May 25, 2008, Wallace presented to the Emergency Department of St. John's Owasso with complaints of lumbar pain.  (R. 352-58).  Wallace reported that the pain had been acutely exacerbated for the last week and was described as moderate and achy.  (R. 353, 356).  Wallace had a normal range of motion in her back and extremities, but had mild paralumbar tenderness on the right side.  (R. 354, 357).  Medical records noted that Wallace was "well known to this [emergency department] for migraine [headaches] and low back pain.  (R. 353, 356).  Wallace was given a prescription for Lortab and directed to follow up with her pain management doctor.  (R. 354, 357).

On May 28, 2008, Wallace presented to Dr. Geren with complaints of low back

---

[28]  A foramen is a natural opening or passage.  *Dorland's* at 696.

discomfort.  (R. 314).  Dr. Geren noted that Wallace reported she had an atrial septal defect[29] and

would be scheduling cardiovascular surgery.  *Id*.  He refilled her pain medication and noted that

she was still being treated by Dr. Calava, her pain management specialist and a neurologist (Dr.

Dean) for her headaches.  *Id*.  Dr. Geren also noted that if Wallace's back problems continued, it

may "be appropriate to repeat her MRI and consider possibly a fresh approach with a new pain

management physician."  *Id*.

At Wallace's next appointment with Dr. Calava on June 12, 2008, she continued to

complain of back pain and muscle spasms, but did not have radiating leg pain.  (R. 289-90).

Wallace reported that the injections she had received had helped for only one week.  (R. 289).

Dr. Calava provided four additional trigger point injections after examination revealed large

palpable trigger points.  *Id*.  Wallace also complained of depression and Dr. Calava assessed her

with mood and sleep disturbances and started her on an antidepressant, Effexor.  *Id*.

On July 10, 2008, Wallace had a follow-up appointment with Dr. Calava.  (R. 288).  She

reported that the trigger point injections had helped considerably and that her muscle spasms had

improved.  *Id*.  Dr. Calava noted that Wallace's range of motion in her lumbar spine had

improved in extension and there was less spasticity of the paralumbar muscles.  *Id*.  Wallace also

reported that her depression had improved with the medication.  *Id*.  Wallace continued to see

Dr. Calava for the remainder of 2008.  (R. 283-87).  During this time, Wallace's symptoms and

pain remained consistent and fairly controlled, with ongoing diagnoses of degenerative disc

disease, chronic lumbar back and lower extremity pain, pain in the lumbar spine, and mood and

sleep disturbances.  *Id*.  On December 1, 2008, Dr. Calava changed Wallace's anti-depressant to

---

[29]  There were no medical records submitted to the Court regarding this alleged defect.
An atrial septal defect is a "congenital anomaly in which there is abnormal communication
between the ascending aorta and pulmonary artery."  *Dorland's* at 463.

Paxil because she could no longer afford Effexor.  (R. 283).

On January 12, 2009, Wallace presented to Dr. Geren with complaints of increasing lower back pain and bilateral leg discomfort and weakness.  (R. 313).  Dr. Geren noted that Wallace had point tenderness throughout her lumbar spine.  *Id.*  He scheduled Wallace for an MRI of her lumbosacral spine, which she later cancelled because she could not afford it.  (R. 311-13).

During her appointment with Dr. Calava on February 19, 2009, Wallace complained of a new onset right hip pain.  (R. 281).  Examination revealed mild palpable tenderness in the right hip.  *Id.*  The hip's range of motion appeared normal, but Wallace reported radiating pain with rotation.  *Id.*

On March 6, 2009, Wallace presented to Dr. Geren with complaints of bilateral hip discomfort, with the majority of it located in the lateral aspect of her right hip.  (R. 311, 381).  Upon examination, Dr. Geren noted point tenderness along the lateral right hip, and a "significant degree of leg length inequality which was corrected with osteopathic manipulation."  *Id.*  An x-ray of the hip revealed no significant abnormalities.  (R. 311, 359, 381).

Wallace continued to be seen on a regular basis by Dr. Geren and Dr. Calava from March 31, 2009 through May 12, 2009.  (R. 370-75, 379-81).  During this time, Dr. Calava continued to note diagnoses of mood and sleep disturbances and made adjustments to Wallace's psychotropic medication in attempts to find more effective treatment.  (R. 370-75).  Wallace also continued to complain of chronic back, hip, and leg discomfort and continued to be prescribed pain medication.  (R. 370-75, 379-81).  Dr. Calava noted that because the opioid pain medication had not been effective, Wallace may be demonstrating opiod hypersensitivity and may need to be weaned off of those medications.  (R. 370-71).  Wallace also reported another episode of

weakness and near syncope.  (R. 379).

In the last half of May 2009 and first part of June 2009, Wallace continued to report chronic pain, which was not relieved by medication.  (R. 376-78).  She was also evaluated for heart palpitations and a 24-hour monitor revealed an elevated average heart rate and elevated blood pressure.  (R. 376-78, 395-97).  Dr. Geren recommended an expedited cardiology consultation.  (R. 376).

On June 17, 2009, Wallace presented to Dr. Hendricks with complaints of ongoing low back and right hip pain, which radiated into the thoracic area, and numbness in the toes on her right foot.  (R. 399-400).  Wallace also expressed concern about whether a possible pregnancy and associated weight gain would cause further harm to her back and damage her fusion.  *Id.* Upon examination, Dr. Hendricks noted normal motor tone, excellent strength bilaterally in the lower extremities with no visible atrophy, good pulses, good sensation with no numbness or tingling, and no dysvascular changes.  (R. 399).  Wallace's right Achilles reflex was diminished in comparison to the left.  *Id.*  X-rays revealed solid arthrodesis[30] with abundant bone formation at L5/S1.  (R. 400).  Dr. Hendricks ordered an MRI, EMG, and nerve conduction studies for further evaluation and to determine whether there was permanent nerve damage.  *Id.*  The subsequent MRI showed a non-severe small amount of scar tissue at L5/S1, and all other levels appeared normal and healthy.  (R. 398).  The EMG and nerve conduction studies were all within normal limits and there was no evidence of any nerve damage.  (R. 398, 401-02).

On June 23, 2009, Wallace was evaluated by cardiologist John Ivanoff, M.D. (R. 403-06).  Wallace reported a history of hypertension, asthma, back pain, headaches, fainting, depression, and irritable bowel syndrome.  (R. 405-06).  Dr. Ivanoff increased the dosage of

---

[30]  Arthrodesis is the surgical fusion of a joint.  *Dorland's* at 152.

Wallace's blood pressure medication and ordered an echocardiogram.  (R. 406).  Other than mild

mitral valvular disease, there were no other abnormal findings from the echocardiogram.  (R.

407-09).

Wallace presented to Gerald A. Snider. M.D. in October 2009 and continued to be seen at

his office on a regular basis through April 2010.  (R. 420-73).  Dr. Snider's records are primarily

hand-written and difficult to decipher, but it appears that during this time Wallace continued to

complain of back pain, left shoulder pain, knee pain, headache, right extremity numbness,

edema, difficulty sleeping, depression, and anxiety.  *Id*.  Lab results also revealed

hyperlipidemia.[31]  (R. 426, 466-73).  Dr. Snider treated Wallace with pain medication, a TENS

unit, massage, diathermy,[32] and spinal rehabilitation exercises.  (R. 420-73).

After the ALJ had rendered his decision, on August 27, 2010, Wallace presented to

Andrew F. Revelis, M.D., with complaints of constant, intractable pain, rated as an 8/10 on a

pain scale.  (R. 503-05).  Wallace described the pain as burning, throbbing, aching, and made

worse with activity.  (R. 503).  Dr. Revelis noted "positive depression," controlled with anti-

depressant medication.  (R. 504).  Examination revealed a full range of motion, negative straight

leg raises bilaterally, normal strength in the upper and lower extremities, and normal and intact

reflexes.  *Id.*  Dr. Revelis assessed Wallace with post spinal fusion syndrome, lumbar

degenerative disk disease, and lower extremity radiculopathy.  *Id.*  Dr. Revelis proceeded with a

lumbar epidural injection.  (R. 502, 505).

At a follow-up examination with Dr. Revelis on September 9, 2010, Wallace reported

---

[31] Hyperlipidemia indicates high lipid levels, usually indicative of high cholesterol and high triglyceride levels.  *See Dorland's* at 852.

[32] Diathermy is the heating of body tissue through the use of electromagnetic radiation, electric currents, or ultrasonic waves.  *Dorland's* at 494.

that after receiving the injection, she had nausea, headache, and lower extremity radiculopathy. (R. 497-98).  Dr. Revelis noted Wallace was able to move all extremities, could walk without an assistive device, and was able to stand from a seated position without difficulties or limitations. *Id*.  Wallace received additional epidural steroid injections from Dr. Revelis from September 2010 through February 2011.  (R. 475-76, 478-79, 495-96).

On November 19, 2010, Wallace presented to Yancy Galutia, D.O., with complaints of depression, increased stress, difficulty sleeping, as well as back and neck pain.  (R. 521-22). Wallace reported that her anti-depressant, Zoloft, was no longer helping.  (R. 521).   Dr. Galutia adjusted Wallace's medication and ordered new lab work.  (R. 521-22).

Wallace returned to Dr. Galutia on December 17, 2010, with complaints of swelling, muscle stiffness and spasm, nausea, and difficulty sleeping.  (R. 517-20).  Wallace reported the new medication had not helped her depression.  (R. 517).  Dr. Galutia's diagnoses included depressive disorder, joint pain and low back pain.  (R. 519).  Wallace was referred for a rheumatology consultation, instructed to follow up with her pain management consultant, and her medication was adjusted.  *Id*.

Wallace did not have any consultative examinations completed.  Nonexamining agency consultant J. Marks-Snelling, D.O., completed a Physical Residual Functional Capacity Assessment on May 7, 2009.  (R. 362-69).  Dr. Marks-Snelling found that Wallace could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds.  (R. 363).  It was also noted that Wallace could stand and/or walk, and could sit for a total of 6 hours in an 8-hour workday.  *Id*.  No other limitations were found.  (R. 363-66).  In the narrative portion of the form, Dr. Marks-Snelling reviewed Wallace's complaints, medical history, including her spinal surgeries, previous work limitations, and her activities of daily living.  (R. 363).

On September 25, 2009, nonexamining agency consultant Lise Mungul, M.D., also completed a Physical Residual Functional Capacity Assessment.  (R. 410-17).  Dr. Mungul's assessment of Wallace's limitations mirrored those found by Dr. Marks Snelling.  (R. 411-14). Dr. Mungul also reviewed Wallace's complaints, activities of daily living, and medical history, including recent medical records that had not been available to Dr. Marks-Snelling.  (R. 411-12).

### Procedural History

On January 29, 2009, Wallace filed an application for Title II disability insurance benefits under the Social Security Act, 42 U.S.C §§ 401 *et seq*.  (R. 13, 116-17).  Wallace alleged the onset of her disability began March 11, 2008.  (R. 116).  The application was denied initially and on reconsideration.  (R. 44-46).  A hearing before ALJ Lantz McClain was held June 7, 2010 in Tulsa, Oklahoma.  (R. 24-43).   By decision dated June 23, 2010, the ALJ found that Wallace was not disabled.  (R. 10-23).  On May 24, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-5).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[33]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin*

*v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The

court "may neither reweigh the evidence nor substitute" its discretion for that of the

---

[33] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Wallace met the insured status requirements through September 30, 2013.  (R. 15).  At Step One, the ALJ found that Wallace had not engaged in any substantial gainful activity since her alleged onset date of March 11, 2008.  *Id.*  At Step Two, the ALJ found that Wallace had a severe impairment of status post back surgery.  *Id.*  At Step Three, the ALJ found that Wallace's impairments, or combination of impairments, did not meet a Listing.  (R. 16).

After reviewing the record, the ALJ determined Wallace had the RFC to perform a full range of sedentary work.  (R. 16).  At Step Four, the ALJ found that Wallace was not capable of performing her past relevant work.  (R. 22).  At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Wallace could perform, taking into account her age, education, work experience and RFC.  (R. 22).  Therefore, the ALJ found that Wallace was not disabled from January 19, 2009 through the date of his decision.  (R. 23).

**Review**

Wallace asserts that the ALJ erred by: 1) failing to develop the record and failing to order a psychological consultive examination; 2) failing to weigh the medical evidence; 3) failing to consider Wallace's nonexertional impairments and therefore misapplying the Grids at Step Five; and 4) failing to perform a proper credibility determination.  Because the Court finds the ALJ failed to develop the record on Wallace's mental impairments and failed to properly evaluate her mental impairments, the other allegations of error are not addressed.

**Development of the Record**

Although it is Wallace's burden to provide medical evidence proving disability, "the ALJ

26

has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Dept. of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993).  Although Wallace did not allege a mental impairment in her application, there was evidence of such in the record, and Wallace's counsel specifically raised the issue of Wallace's depression and anxiety at the hearing and requested a psychological consultative examination.  (R. 28).  It is the ALJ's responsibility to ensure that an adequate record is developed consistent with the issues raised in the disability hearing.  *Grogan v. Barnhart*, 399 F.3d 1257, 1263-64 (10th Cir. 2005) (*quoting Henrie v. U.S. Dept. of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)).

It is clear from the record that Wallace first complained of depressive symptoms no later than June 2008.  (R.289-90).  Wallace was treated by her treating physicians for well over two years with anti-depressant medications, which were adjusted multiple times in an attempt to relieve her symptoms.  (*E.g.*, R. 283, 289, 370-75, 437, 517-22).  Wallace specifically alleged symptoms of depression and anxiety at the hearing before the ALJ.  (R. 30, 38-40).  While an ALJ need not "exhaust every possible line of inquiry," a "consultative examination "becomes 'necessary'. . . when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment."  *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (*quoting Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)).  *See also Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1996) (depression diagnosis required ALJ to develop the record even though it was not mentioned in claimant's application).  Wallace presented more than just the "presence" of a diagnosis and more than her own isolated unsupported comments regarding her mental impairments; the ALJ should have further developed the record and ordered a consultative examination.  *Hawkins*, 113 F.3d at 1167.  This error becomes even more evident when combined with the ALJ's failure to properly evaluate the severity of Wallace's mental

impairments.

**ALJ's Evaluation of Mental Impairments**

The ALJ acknowledged that medical evidence contained evidence of depression and that Wallace complained of depression and anxiety.  (R. 15, 21).  However, the ALJ summarily found that the mental conditions were non-severe and did not affect Wallace's ability to work.  (R. 15). The ALJ did not apply the proper analysis for making a determination of the severity of a mental impairment.

It appears from the ALJ's decision that he determined Wallace had medically determinable mental impairments of depression and anxiety, as those were not included in his list of Wallace's non-medically determinable conditions and he proceeded to make a severity finding of those impairments.  (R. 15).  *Grotendorst v. Astrue*, 370 Fed.Appx. 879, 882 (10th Cir. 2010) (unpublished) (treating impairment as medically determinable when ALJ made severity findings).  After a claimant has established a medically determinable mental impairment, the ALJ must apply a "special technique" to "rate the degree of functional limitation resulting from the impairment(s)" 20 C.F.R. §§ 404.1520a; 416.920a.  This technique requires the ALJ to rate the claimant's limitations in "four broad functional areas," which are "activities of daily living; social functioning; concentration; persistence, or pace; and episodes of decompensation." *Id*. at §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ must then use the functional-limitation ratings to determine the severity of the mental impairment(s).  *Id*. at §§ 404.1520a(d), 416.920a(d).  In order to document the application of the special technique, the ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique. . . The decision must include a specific finding as to the degree of limitation in each of the functional areas. . . . " *Id*. at

§§ 404.1520a(e)(2), 416.920a(e)(2); *Wilson v. Astrue*, 602 F.3d 1136, 1141 (10th Cir. 2010);

*Mushero v. Astrue*, 384 Fed.Appx. 693, 694 (10th Cir. 2010) (unpublished).  Here, the ALJ did

not cite to the applicable regulation, let alone document its special technique in his decision.

While recognizing the existence of Wallace's mental impairments, the ALJ rated the

severity of those impairments without first making the required findings in each of the four broad

functional areas.  Here, the ALJ simply concluded Wallace's mental impairments were non-

severe because "[e]vidence of record includes no evaluation, treatment, or complaint of any

limiting effect of depression or anxiety."  (R. 15).  First, this is an inaccurate statement of the

record.  As discussed above, Wallace complained of, and was treated for symptoms of

depression for over two years.  Later in the decision, the ALJ appears to discount this treatment

and criticizes Wallace for not seeking treatment from a mental health expert or psychiatrist.  (R.

21).  Although this may be relevant to other findings in his decision, it is irrelevant to the ALJ's

determination of the severity of an impairment.  *See Grotendorst*, 370 Fed.Appx. at 883

(consideration of treatment does not play role in severity determination).  As explained in

*Grotendorst*, "the lack of treatment for an impairment does not necessarily mean that the

impairment does not exist or impose functional limitations.  Further, *attempting to require

treatment as a precondition for disability would clearly undermine the use of consultative

examinations*."  370 Fed.Appx. at 883 (emphasis added).

There are no mental consultative examinations in the record, as the ALJ denied Wallace's

request for one, no Psychiatric Review Technique form, and no Mental RFC form to document

the ALJ's determination. The Court is unable to meaningfully review the ALJ's findings where

he failed to document his findings, failed to support the findings with substantial evidence, and

failed to apply the special technique required by the regulations.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

Because the errors of the ALJ related to Wallace's mental impairments require reversal, the undersigned does not address the other contentions raised by Wallace.[34] On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Wallace.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 21st day of March 2013.

Paul J. Cleary
United States Magistrate Judge

---

[34] The Court does note that one of the ALJ's reasons for finding Wallace not credible was that she made inconsistent reports of the existence of leg weakness/numbness to Dr. Calava and Dr. Geren, but review of the record revealed this to be incorrect. (R. 20).